# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **ILENE F. GOLDSTEIN, not individually. but solely in her capacity as Trustee of the Estate of Cold 2005, Inc.,** <br><br>         **Plaintiff,** <br><br>         **v.** <br><br> **COLBORNE ACQUISITION COMPANY, LLC, d/b/a COLBORNE FOODBOTICS, LLC, an Illinois Limited Liability Company; RICHARD HOSKINS III; LINDA HOSKINS; RICHARD HOSKINS IV; LYSA HOSKINS; and HOSKINS PROPERTY, LLC, a Delaware Corporation,** <br><br>         **Defendants.** | **Case No. 10 C 6861** <br><br> **Hon. Harry D. Leinenweber** |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' Motion for a Protective Order and Plaintiff's Cross-Motion/Response to Compel. For the reasons contained herein, the Plaintiff's Motion to Compel is granted. The Motions of Defendant Colborne Acquisition Company, LLC ("CAC") and Individual Defendants Richard Hoskins III's ("R3"), Richard Hoskins IV ("R4") and Lysa Hoskins ("Lysa") for a Protective Order is denied.

### I. BACKGROUND

Familiarity with the Court's previous background statements in its rulings of March 11, 2011 and July 27, 2011 is presumed. The

Court therefore, provides only a minimum of facts necessary to this opinion.

R3, R4 and Lysa were all shareholders in Colborne Corp. ("Colborne 1"). R3 was the president and owner (90 percent shareholder) of Colborne 1. R4 and Lysa (who are siblings and the daughter of R3) each owned 5 percent and were officers of Colborne 1. In 2008, a New Jersey court entered judgment against Colborne 1 for $538,167.08 for a former Colborne 1 customer, Mamacita, Inc. ("Mamacita"). After appeal and further court proceedings, Plaintiff says, the judgment tripled. (R3 denied this alleged fact in his answer, but enunciated no basis for the denial.) Mamacita pursued Colborne 1 to the Lake County, Illinois courts in an effort to collect, but was thwarted by a Uniform Commercial Code sale of all Colborne 1 assets to Colborne Acquisition Company, LLC ("Colborne 2") on May 19, 2009. R3 consented in writing to the sale of Colborne 1's assets.

Mamacita filed the instant lawsuit on October 25, 2010, alleging the UCC sale was a fraudulent effort to avoid judgment. On November 29, 2010, Colborne 1 filed for Chapter 7 bankruptcy. The Bankruptcy Trustee stepped into Mamacita's shoes as Plaintiff. The Trustee has been attempting, both in Bankruptcy Court and here, to obtain the pre-UCC sale company e-mails of Colborne 1. Colborne 2, as purchaser of Colborne 1's assets, is in possession of the e-mails. *See* Colborne 2's Reply, 7 (stating "there is no

contractual provision whereby [Colborne 2] agreed that pre-UCC sale emails would remain the property of [Colborne 1]. To the contrary, the Bill of Sale provides that all assets were sold to [Colborne 2], and that [Colborne 2] has full right and title to those assets.").

R3, R4 and Lysa, collectively, have filed for a protective order, arguing the pre-sale e-mails contain correspondence between them and their individual attorneys and are subject to attorney-client privilege. R3 also contends there are e-mails containing his other, minor children's Social Security numbers and medical information. Colborne 2 also filed a motion for a protective order, ostensibly because it could face liability from the individual defendants if it turned over their privileged information.

The parties met and conferred on the issue on March 7, 2012. Counsel for Colborne 2 and the individual defendants thought they left that meeting with an agreement by trustee's counsel that, by electronically searching for certain terms, those e-mails would be segregated and given to Hoskins' counsel for review before turnover to the trustee. (The bulk of the pre-sale e-mails, 99.9 percent of the e-mails at issue, were produced by Colborne 2 during the course of briefing this issue.)

Counsel for trustee, Riccardo A. DiMonte ("DiMonte"), denies an agreement was reached. DiMonte informed opposing counsel on

March 13, 2012 that he did not agree with the Hoskins' counsel screening these e-mails before turnover. On March 22, 2012, DiMonte appeared before this Court and represented that the parties were "cooperating in good faith" on the issue and that it was "not worth motion practice," at that time, but that eventually, "we may have to resort to some motion practice."

Eventually came rather quickly. DiMonte left this Court and filed a Motion for the e-mails in Bankruptcy Court four (4) hours later. Defendants filed their Motions for a Protective Order, and Bankruptcy Judge Goldgar has entered and continued the Motion to compel until after this Court has ruled on the issue. *See* Individual Defs.' Reply, 2. Given DiMonte's behavior, Defendants have asked for reasonable costs in filing and briefing this motion for a protective order.

The Trustee argues she is entitled to the e-mails on three grounds. First, as Trustee of Colborne 1, the e-mails are on Colborne 1's server and are thus the property of the estate, which the Trustee controls.

Second, she maintains that the individual Defendants waived attorney-client privilege by writing their attorney on their work e-mail account. Colborne 1 had a written policy whereby:

> [E]mployees are not permitted to use the information systems for personal use during normal business hours. This includes E-mail and any access to the internet or related service. Colborne management will permit personal activities of this nature outside of normal business hours. . . .

> All messages and web-use logs are Colborne records.
> Colborne reserves the right to access and disclose all
> messages sent over its electronic mail system for any
> purpose.

Pl.'s Response, Ex. A; ECF No. 88-1, PageID 1128.

## II. <u>**LEGAL STANDARD**</u>

"Because a claim of privilege has the effect of withholding relevant information from the trier of fact, the attorney-client privilege is construed to apply only where necessary to achieve its purpose." *Smith v. Berge*, 1998 U.S. App. LEXIS 4400, at *5-6 (7th Cir. Mar. 9, 1998). That purpose is to foster free and open communication between a party and his lawyer regarding legal advice.

The party seeking to invoke the privilege bears the burden of proving all of its essential elements. *United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997). Because the privilege is in derogation of the search for the truth, it is construed narrowly. *Id.*

"[T]he recognition of a privilege based on a confidential relationship should be determined on a case-by-case basis." *Upjohn Co., et al. v. United States, et al.*, 449 U.S. 383, 396 (1981) (additional citations and punctuation omitted).

"The Supreme Court reasoned that a bankruptcy trustee has the authority to waive a corporation's attorney-client privilege because the trustee exercises functions analogous to those

exercised by management." *In re L&S Indus.*, 989 F.2d 929, 933-934 (7th Cir. 1993).

In regards to waiver, "[w]hile the client need not intend to waive the privilege (or even be aware of its existence), he must intend to disclose the privileged information or to consent to its disclosure. If the client intended to disclose certain matters, he will not be heard to later say that he did not realize that he was disclosing privileged material or that such disclosure amounted to a waiver of the privilege." Charles Alan Wright & Kenneth W. Graham, Jr., FEDERAL PRACTICE & PROCEDURE, §5507, 578 (West Publishing Co. 1986). "If the client cares so little for the confidentiality of the communications as to fail to take steps to insure against unintended disclosures, it is hard to justify requiring the court to take elaborate measures to protect the client against the results of his own carelessness." *Id.* at 387 of 2011 Supplement.

"Who can waive the privilege? . . . This normally will be the client; if she does not consent to the disclosure, there is no waiver even though the privileged information is published in the newspapers." *Id*. at 577.

Whether use of work e-mail to communicate with an attorney destroys the privilege is a relatively undeveloped area of law, both nationally and in this District.

The Court found just one case in the District dealing with it. *DeGeer v. Gillis*, No. 09-6974, 2010 U.S. Dist. LEXIS 97457, at *26

(N.D. Ill. Sept. 17, 2010). It relied heavily on *United States v. Hatfield*, and its five-factor test asking (1) does the employer maintain a policy banning personal use of e-mails; (2) does the employer monitor the use of its computer or e-mail; (3) does the employer have access to the computer or e-mails; (4) did the employer notify the employee about these policies; and (5) how did the employer interpret its computer usage? *United States v. Hatfield*, 2009 U.S. Dist. LEXIS 106269, at *8-10 (E.D.N.Y. Nov. 13, 2009). In *DeGeer*, the parties had not addressed most of the factors and the record did not reflect information regarding Factors 1, 2, 4. *DeGeer*, at *26-28. However, the *DeGeer* court found that the employer clearly had the right to access the employee's laptop, but that the employer's actions (screening plaintiff's e-mails for privilege before responding to defendants' subpoenas) unequivocally showed the employer thought plaintiff had not waived attorney-client privilege.

The test in *DeGeer* seems derived from the most oft-quoted case on the subject, *In re: Asia Global Crossing, Ltd., et al.*, 322 B.R. 247, 257 (S.D.N.Y. 2005). *Asia Global* looked to Fourth Amendment case law on expectations of privacy in the workplace to develop its test. In looked to four, rather than five, factors: (1) whether the corporation banned personal or objectionable use of company computer or e-mail; (2) whether the company monitored the use of the employee's computer or e-mail; (3) whether third parties had a

right of access to the computer or e-mail; and (4) whether the corporation notified the employee, or whether the employee was aware, of use and monitoring policies. In formulating that test, the *Asia Global* court looked to this Circuit's *Muick v. Glenayre Elecs*., 280 F.3d 741, 743 (7th Cir. 2002) (finding no reasonable expectation of privacy in workplace computer files where employer had announced that he could inspect the computer). It also reviewed *United States v. Simons*, 206 F.3d 392, 298 & n.8 (4th Cir. 2000) (finding no reasonable expectation of privacy in office computer and downloaded Internet files where employer had a policy of auditing use and employee did not assert that he was unaware of or had not consented to the policy).

In *Asia Global*, the court found no waiver because the subjective belief that the messages were sent in confidence was reasonable. That conclusion stemmed in part, from the claims of those asserting the privilege that no policy regarding e-mail use existed, and the trustee's showing of two existing corporate-family written policies was negated by the fact that neither specifically noted it applied to the company at issue. The court thus found no waiver.

### III.  **ANALYSIS**

The Court dismisses the argument that the Trustee owns the e-mails. That may very well be true, but it fails to win the day here for two reasons. First, whether the sale of Colborne 1 was a

legitimate sale of a fraudulent slight of hand to avoid a creditor is the ultimate issue of this case (and likely the bankruptcy case). It would be premature to decide it now.

Even if the Court did decide in the Trustee's favor, it would not resolve the privilege issue. A Trustee can waive the corporation's attorney-client privilege, but she cannot speak for an individual's attorney-client privilege. *See, generally, In re: Asia Global Crossing, Ltd., et al.*, 322 B.R. 247 (trustee's possession of business where former officers' privileged e-mails were on company's server remained privileged despite trustee's possession of the business). If waiver is to be found, it must come from the actions of the individual client or his agent acting on his behalf.

**A. Richard Hoskins III's Waiver**

Defendants have maintained throughout this litigation that Colborne 2 is a legitimate, separate corporate entity not owned by the Hoskins. That makes part of this decision relatively easy. No attorney-client privilege can exist in regards to the e-mails written to or from R3, because he signed the agreement consenting to the sale of Colborne 1's assets. He knew, or should have known, that the sale included the company's servers and its e-mails, including his own personal e-mails. As Colborne 2's own counsel wrote "there is no contractual provision whereby [Colborne 2] agreed that pre-UCC sale emails would remain the property of

- 9 -

[Colborne 1]." Colborne 2's Reply, 7. That R3 may not have realized the import of his actions is immaterial. "If the client intended to disclose certain matters, he will not be heard to later say that he did not realize that he was disclosing privileged material or that such disclosure amounted to a waiver of the privilege." *See* Wright & Graham, *supra*. R3 deliberately disclosed, by sale, his e-mails to a third party (Colborne 2) and waived the privilege.

### B. Richard Hoskins IV and Lysa Hoskins' Waivers

The same might well be said of R4 and Lysa if it could be shown they knew of the sale and consented to it. This seems likely, but has not been definitively shown at this point. The record indicates that R4 and Lysa were company officers, but approval, or even knowledge, of every company officer is not necessary to sell the business.

Thus, the Court then moves to the issue of whether their use of a company e-mail system to correspond with their individual attorney waived attorney-client privilege.

The Court prefers the four *Asia Global* factors over *DeGeer*'s five factors. That is because the fifth factor, involving the employer's attitude or beliefs as to the privilege of the communication, seems irrelevant. Waiver must come from the actions of the client, and what he knew or believed regarding the

confidentiality of the communication. What another party believes seems irrelevant.

Additionally, while the Court leans on the *Asia Global* factors, it does not rely on that case as the exclusive authority, as each privilege waiver inquiry must be a case-by-case analysis, and there are facts present here that were not present there.

Defendants argue the first factor weighs in their favor because personal use was permitted outside normal business hours. However, it also banned objectionable use (use during work hours and use as a means of transmitting racially or sexually charged material). The Court is mindful that the point of all these factors is assessing the reasonableness of an employee's belief that their messages would remain confidential. Defendants' belief that this factor weighs in their favor forgets the point of the entire exercise, whether the belief of confidentiality was reasonable. More specifically, the point of this factor is to assess whether there were any restrictions on use of the company e-mail. If there were, an employee's belief that his communications were confidential is less reasonable, because if a third party can dictate the means of communication, an employee is less reasonable in believing it secure. While this policy allowed employees to feel comfortable that they would not be fired for personal use of the work e-mail system, it gave them no comfort that their information was secure. To the contrary, it unequivocally stated

that "[a]ll messages . . . are Colborne records.  Colborne reserves the right to access and disclose all messages sent over its electronic mail system, for any purpose."  Thus, the first factor weighs heavily against Defendants.

The second factor, whether the company actually monitored e-mail (which Defendants identify as practice rather than policy) weighs in Defendants' favor because they maintain they never monitored employees' e-mail.

The third factor, whether third parties had a right of access, is somewhat redundant of the first.  Third parties most certainly did have a right of access, because whatever employees wrote became the company's property under the policy.

The fourth factor – whether the employee was aware of the company policy – is the most interesting in this case.  A policy itself caries some implication that employees were on notice.  But the Court sees that there might be some reasonable dispute of that proposition if the policy were never disseminated to employees.  On this point, both parties are silent.  That is fatal not to Plaintiff, but to Defendants.  It is, after all, the burden of the party claiming privilege to show it has met the criteria for it.  *See Simons*, 206 F.3d 392, 398 & n.8 (no reasonable expectation of privacy where employee asserting privilege failed to assert that he was unaware of policy).  That Defendants did not allege they were unaware of the policy is not surprising.  They owned the company

and were its officers. They likely cannot make that assertion with a straight face.

Instead, they maintain that once the e-mails were sold, they were never looked at or accessible by anyone at Colborne 2 but themselves, because they still have password protection over them. This is irrelevant. R4 and Lysa have not asserted that they were not on notice that Colborne 1 owned their e-mails the moment they sent them. Whether anyone else saw them is beside the point. "[A] waiver can also take place where there is a 'consent to disclosure.'. . . Hence, if the client deposited his communications in the public library, the privilege would be waived, even though no one ever read them. . . ." Wright & Graham, FEDERAL PRACTICE & PROCEDURE, §5507, 580 n.126 (West Publishing Co. 1986).

In consideration of all the factors, the Court finds that R4 and Lysa's subjective belief that their communications were confidential was not a reasonable one in light of the company policy in place, and in light of their failure to assert that they were unaware of it. (Incidentally, this also applies to R3, which the Court found already willingly disclosed his e-mails.) They knew what they wrote immediately became company property. Thus, the privilege was waived.

### C. Richard III's Minor Children's Information

R3 has protested that the e-mails contain irrelevant information regarding his minor children's health information and

Social Security numbers. The Court rules that the producing parties may redact the minor children's Social Security numbers, and any documents discussing their health issues may be labeled as "confidential" and, although not a trade secret, treated as such under the terms of the parties' confidentiality agreement. ECF 42-1. Defendants are warned not to abuse this concession by the Court as a tactic for delay, which has already been substantial on their part. Defendants must produce the remaining Colborne 1 e-mails, including the ones bearing redacted Social Security numbers and those marked "confidential" within seven (7) days of entry of this order.

### D. DiMonte's Misdirection

While the Court is ruling for the Trustee in this discovery matter, it finds its attorney's representation to the Court disturbing. Mr. DiMonte appeared here representing that all was well and the parties were working out their discovery issues and no intervention by the Court was needed. Then, four hours later, he filed in Bankruptcy Court for this discovery. This misrepresented the true state of affairs to both this Court and opposing counsel. The Court also finds incredible DiMonte's written representation to this Court that he only filed in Bankruptcy Court after learning, post-hearing, that Defendants intended to continue fighting the discovery. That is belied by Defendants' e-mail the day before clearly informing Plaintiff's counsel it intended to continue to

fight the discovery. *See* Colborne 2's Reply, 5. This written obfuscation by Mr. DiMonte only takes his previous oral misrepresentation and makes it worse.

"In general, courts may impose appropriate sanctions, including dismissal or default, against litigants who violate discovery rules and other rules and orders designed to enable judges to control their dockets and manage the flow of litigation." *Hoskins v. Dart*, 633 F.3d 541, 543-544 (7th Cir. 2010). The Court should, as a rule, consider sanctions not as serious as dismissal of an action. *Id.*

The Court finds Mr. DiMonte's less-than-forthright representation delayed proceedings in this Court unnecessarily, and created unnecessary litigation. DiMonte went to Bankruptcy Court on a Motion that was subsequently stayed by that Court, sending him back here. Both parties were then forced to come back here and address an issue Mr. DiMonte had hid from this Court. That created unneeded motion practice for the Bankruptcy Court and for Defendants. In an effort to prevent the Trustee's counsel from repeating such behavior, the Court orders Mr. DiMonte and his firm not to bill the Trustee for his appearance in this Court on March 22, 2010 nor for the time spent writing the Trustee's Response (ECF No. 88). The Court prefers this sanction to charging Defendants' time to the Trustee, because that would just deplete the estate and potentially injure its creditors. Additionally,

Defendants have not been paragons of cooperation in discovery in this case either, and declines to assess the Trustee for their costs.

## IV. CONCLUSION

For the reasons stated herein, the Court rules as follows:

1. Plaintiff's Motion to Compel is granted. Colborne 2 is to produce the pre-UCC sale e-mails still outstanding within seven (7) days of entry of this order

2. Defendants' Motions for a Protective Order is denied; and

3. As a sanction for his misrepresentation to this Court and its resultant delay of proceedings, Mr. DiMonte and his firm are not to charge the Trustee for their March 22, 2012 appearance nor for the time spent preparing the Trustee's Response/Motion to Compel.

**IT IS SO ORDERED.**

　　　　　　　　　　　　　　　　　　Harry D. Leinenweber, Judge
　　　　　　　　　　　　　　　　　　United States District Court

**DATE:** 6/1/2012